Bonnie MENDELSON, Plaintiff,

v.

DELAWARE RIVER & BAY
AUTHORITY, Defendant,

Delaware River & Bay Authority,
Third–Party Plaintiff,

v.

Saajos Oy, Oy Saajos International,
Ltd., and Pelmatic Knud E. Han-
sen A/S, Third–Party Defendants.

Civil Action No. 98–90–GMS.

United States District Court,
D. Delaware.

April 9, 1999.

Barbara MacDonald, Neal C. Belgam,
Morris, James, Hitchens & Williams Wil-
mington, DE, for third-party defendant
Saajos Oy.

Donald E. Reid, Bradley James Enna, of
Morris, Nichols, Arsht & Tunnell, Wil-
mington, DE, for defendant & third-party
plaintiff Delaware River & Bay Authority.

## MEMORANDUM OPINION

SLEET, District Judge.

### I.  INTRODUCTION.

On September 3, 1997, Bonnie Mendel-
son, the plaintiff in this diversity action,

filed a complaint against the Delaware River and Bay Authority, alleging that she injured her right hand, arm, and shoulder when she tried to open a hydraulic or pneumatic sliding door located on a ferry boat, the Twin Capes, operated by the Authority (or the "DRBA"). Because the parties are diverse and the amount in controversy exceeds $75,000, the court may properly exercise jurisdiction over this matter. *See* 28 U.S.C. § 1332 (1994).

On December 23, 1998, the Authority filed an amended third-party complaint against Saajos Oy, a Finnish corporation which manufactured the sliding door that purportedly caused Mendelson's injuries. Before filing an answer, Saajos moved to dismiss for lack of personal jurisdiction.

Because the court concludes that Saajos falls within the reach of Delaware's long-arm statute, Del.Code Ann. tit. 10, § 3104(c) (1998), and that exercising personal jurisdiction over the third-party defendant in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause of the Fourteenth Amendment, the court will deny the motion.

## II. BACKGROUND.

In 1993, the DRBA decided to refurbish its fleet of ferries. As part of this project, the Authority sought to replace the fire doors in several of its vessels. Toward this end, Knud E. Hansen, a Danish company which served as the Authority's design consultant for the Twin Capes project, contacted Saajos, asking the Finnish corporation to submit a bid. Shortly thereafter, Saajos received a series of deck plans and door specifications to assist it in formulating an accurate price quotation. These documents identified the DRBA as the owner of the boat.

Saajos then entered into a series of negotiations with Jamestown Metal Marine Sales, Inc., a Florida corporation, which was serving as the Authority's agent for procuring the fire doors for the Twin Capes. On January 21, 1995, Saajos submitted a bid that included a guarantee of its work for twelve months from the date that the vessel was delivered to the owner. At the time, Saajos was in possession of an internal document which referred to this project as the one involving the "Delaware ferries."

After Saajos won the bid, it exchanged a series of letters with Jamestown which again referred to the "DRBA Ferries." During this time, Saajos was engaged in the construction of the fire doors, which were built entirely in Finland.

On May 3, 1995, before Saajos completed the project, it sent Jamestown a short facsimile, stating that there "had been some accidents with passengers leaving their fingers between the wall." As a result, Saajos wanted to equip the sliding fire doors with a new set of handles, although it seems that this change was either never authorized, never made, or both. Five months later, on October 17, 1995, Saajos received a letter from Jamestown which again identified the DRBA as the owner of the Twin Capes, stating that the acronym stood for the Delaware River and Bay Authority and providing the Authority's business address as being located in New Castle, Delaware.

After Saajos completed construction of the doors, it shipped them to Virginia, where they were installed on the Twin Capes. However, pursuant to the terms of the delivery agreement, title passed in Finland. For its work on the Twin Capes refurbishment, Saajos received $149,000.

Months after the fire doors were installed and the Twin Capes was once again transporting passengers back and forth across the Delaware Bay, Mendelson was injured while on board. Apparently, her fingers were caught in the handle of one of the sliding fire doors as she was attempting to open it. As a result, Mendelson's right hand and arm were crushed as the door slid into a nearby wall. The accident seems to have occurred somewhere between New Jersey and Delaware, although

no party can pinpoint its exact location with certainty at this time.

Five months after the accident, Saajos submitted a new bid for a new set of fire doors which were going to be installed in another DRBA ferry, the Cape May. Negotiations for this project occurred directly between Saajos and the Authority. Ultimately, Saajos won the bid, once again delivering the finished doors to Virginia, even though title again passed in Finland. For its work on the Cape May refurbishment, Saajos received an additional $200,000.

With these facts in mind, the court turns to a discussion of the applicable law.

## III. DISCUSSION.

The determination of whether Saajos is subject to personal jurisdiction entails a two-step process. *See Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 483 (Del.1992) (citing *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del.1986)). First, the court must examine whether the language of the Delaware long-arm statute, Del. Code Ann. tit. 10, § 3104(c), reaches the defendant. *See Transportes Aereos de Angola v. Ronair, Inc.*, 544 F.Supp. 858, 864 (D.Del.1982). Then, if the court concludes that Saajos falls within the grasp of the State's long-arm statute, it must explore whether subjecting the defendant to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment. *See Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F.Supp.2d 690, 694 (D.Del. 1998). Because the court finds that Saajos contracted to supply a set of custom-made goods for use in the State of Delaware and derived substantial revenue from these transactions, the court concludes that the third-party defendant established sufficient contacts with the forum to bring it within the jurisdiction of the Delaware courts.

### A. The Language Of The Long-Arm Statute.

The court finds two portions of Delaware's long-arm statute relevant here. First, the court "may exercise personal jurisdiction over any nonresident ... who ... [c]ontracts to supply services or things in th[e] State" of Delaware. *See* Del.Code Ann. tit. 10, § 3104(c)(2). Second, the court may also exercise personal jurisdiction over a nonresident who, through an act or omission outside of the State, causes tortious injury to another either inside or outside of the State as long as the wrongdoer "derives substantial revenue from services or things used or consumed in the State." *Id.* at § 3104(c)(4). The court should interpret the language of these provisions liberally, as "conferring jurisdiction to the maximum extent of the due process clause." *See, e.g., Jeffreys v. Exten*, 784 F.Supp. 146, 151 (D.Del.1992).

#### 1. Subsection (c)(2).

Contending that it falls outside of a literal reading of subsection (c)(2), Saajos points out that it never specifically agreed to supply the fire doors in the State of Delaware. Instead, the third-party defendant notes, it only promised to deliver the doors to Virginia; a promise upon which it ultimately made good. As a consequence, Saajos argues, it does not fall within the express language of the State's long-arm statute. *See Mumford v. Carey's Diesel, Inc.*, C.A. No. 93C-06-032, 1995 WL 108885, at *3 (Del.Super. Feb.6, 1995) (declining to exercise jurisdiction in a situation where the plaintiff picked up the goods outside of Delaware, even though the defendant knew that they were being brought back to the State).

The court, however, believes that Saajos interprets Delaware's long-arm statute too narrowly, at least under the particular circumstances of this case. In the opinion of the court, Saajos looks only to the letter of its contract, ignoring the spirit of the agreement. Specifically, Saajos did not simply contract to supply a generic or

fungible set of mass-produced doors which could fit into any frame in any wall in any ship or building in the nation. Instead, the Finnish company agreed to manufacture a set of custom-made fire doors which were designed specifically for the Twin Capes, a "Delaware ferr[y.]" Thus, although Saajos did not engage in contractual negotiations in Delaware and although the contract that resulted from these negotiations did not expressly require Saajos to ship the fire doors to Delaware,[1] the company did know that the doors were going to be installed in a vessel that was going to not only be moored or anchored in the State but also transport cars and passengers within Delaware territorial waters.

In short, the court distinguishes this case from the one in *Mumford* where the plaintiff traveled to the defendant's place of business to pick up a bundle of insulated blankets which could apparently be transported, sold, or used anywhere in the United States. 1995 WL 108885, at *1, *3. Unlike the products in *Mumford*, the doors at issue here could only be used on the Twin Capes since they were designed specifically for that vessel. For this reason, the court declines to adopt the hypertechnical reading of either the statute or the contract, which Saajos proposes. *Cf. Moore v. Little Giant Indus., Inc.*, 513 F.Supp. 1043, 1047 (D.Del.1981) (rejecting the argument that subsection (c)(2) did not apply simply because title to the product passed outside of Delaware).

Admittedly, the defendant in *Moore* actually shipped the good in question to Delaware directly. *Id.* at 1045. While the situation here is one step removed, since Saajos shipped the fire doors to Virginia for installation in the Twin Capes before the vessel was ultimately transported to Delaware, for the reasons previously discussed, the court believes that a liberal reading of both the contract and the long-arm statute is appropriate here. *Cf. Blue Ball Properties, Inc. v. McClain*, 658 F.Supp. 1310, 1315 (D.Del.1987) (recognizing that both the state and federal courts have interpreted Section 3104 broadly to confer the "greatest coverage possible" consistent with due process). As a consequence, the court concludes that Saajos falls within the reach of subsection (c)(2).

2. Subsection (c)(4).

The court also believes that subsection (c)(4) provides an appropriate basis for the exercise of personal jurisdiction over Saajos in this case since the third-party defendant derived substantial revenue from its sales of the fire doors, which were specifically designed for use within the State. *See* Del.Code Ann. tit. 10, § 3104(c)(4).

Unlike subsection (c)(2), which confers jurisdiction on the basis of a single act as long as that act is related to the subsequent legal claim, subsection (c)(4) provides general jurisdiction over a nonresident, whether or not the act or omission is related to the claim. As a result, it requires somewhat greater contact between the nonresident and the forum. *See Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1466 (D.Del.1991) (citing *LaNuova*, 513 A.2d at 768). Under subsection (c)(4), both the origin of the doors and the location of the accident are immaterial to the court's analysis. *See* Del. Code Ann. tit. 10, § 3104(c)(4) (stating that the injury may occur inside *or* outside of the State and that the act giving rise to

---

1. For a case contemplating this distinction, see *Outokumpu Eng'g Enter., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 728 (Del.Super.1996) (citing *Red Sail Easter Partners v. Radio City Music Hall Productions*, C.A. No. 12036, 1991 WL 129174, at *3 (Del.Ch. July 10, 1991)). While *Outokumpu* interpreted subsection (c)(2) as requiring "some act [to] be performed 'in the State' in order to support specific jurisdiction," the court notes the difference between "contracting in the State to supply services or things" and "contracting to supply services or things in the State." Here, the General Assembly has chosen to adopt the latter wording. *See* Del.Code Ann. tit. 10, § 3104(c)(2). For this reason, the court interprets the long-arm statute as reaching Saajos under the specific facts of this case.

440

this injury may also occur outside of the State). Instead, the court must focus on whether Saajos "derive[d] substantial revenue from services or things used or consumed in the State." *Id.*

On this point, Saajos contends that its activities cannot possibly fall within the scope subsection (c)(4) since the doors in Delaware were not actually sold in Delaware, *see Plumb v. Cottle*, 492 F.Supp. 1330, 1334 (D.Del.1980), *Finkbiner v. Mullins*, 532 A.2d 609, 619–20 (Del.Super.1987), and since the third-party defendant only once contracted with the DRBA for the sale of any doors. *See Fischer v. Hilton*, 549 F.Supp. 389, 392 (D.Del.1982). The court disagrees with these arguments and will address them *seriatim.*

First, the plain language of subsection (c)(4) requires only that the products be "used or consumed" within the State. Nowhere does the statute explicitly state that the goods or services must also be sold in Delaware. Although services generally cannot be "used or consumed" in the State without actually being provided here, the same is not true for goods. In fact, as this case illustrates, the exact opposite is true. Goods can be provided outside of Delaware for use or consumption here. Of course, the product at issue in this case, the fire door, was specifically designed for use in the State since it was custom-built to fit in the Twin Capes. Thus, the court concludes Saajos falls within a literal reading of subsection (c)(4).

Second, embracing a strand of *dicta* contained within the *Fischer* opinion, 549 F.Supp. at 392, Saajos argues that earnings from one, lone transaction no matter how great cannot possibly satisfy the substantial revenue requirement of subsection (c)(4) since the two preceding clauses require some greater degree of continuous or systematic contact with the State. *See*

Del.Code Ann. tit. 10, § 3104(c)(4). In advancing this argument, Saajos makes three errors.

■ First, while the two clauses which proceed the one concerning substantial revenue do require regular or persistent contact with the State, the court does note that the General Assembly used the disjunctive "or" when separating the three. Thus, subsection (c)(4) applies when a nonresident defendant *either* (1) regularly transacts or solicits business in the State, (2) engages in any other persistent course of conduct in the State, *or* (3) derives substantial revenue from services or things used or consumed in the State. *See* Del. Code Ann. tit. 10, § 3104(c)(4). As a result, the court believes that the substantial revenue derived from the services or goods consumed or used within Delaware need not necessarily result from a series of contacts with the State.

Second, even if the substantial revenue clause required more than one contact with Delaware, Saajos forgets that it *twice* contracted to manufacture a set of custom-made fire doors for two different Delaware ferries.[2] It did so once, in 1995, with Jamestown, who was acting as an agent for the DRBA and, again, in 1997, with the Authority itself. As a result, the claim that "Saajos made only one sale to a buyer with any ties at all to Delaware" seems disingenuous at best.

Third, and finally, even if the court focused solely on the second transaction with the DRBA itself, the court notes that Saajos was paid $200,000 for its work on this project. While the *Fischer* court believed that "it [wa]s logical ... to require more than one sale under the substantial revenue clause" since the General Assembly also used the words "services" or "things" in the statute, 549 F.Supp. at 392, the court notes that the legislature's use of the

**2.** Although the DRBA does not make this argument, the court recognizes that given the unique nature of the ship refurbishment industry, Saajos may never engage in anything other than a short series of contacts with any

particular jurisdiction before moving onto its next project. As a result, in many instances, one or two contacts may prove to be the only connection Saajos has with a forum.

plural form does not necessarily suggest that one transaction would not suffice to confer jurisdiction under subsection (c)(4). Most notably, the court can imagine a situation where, as here, a nonresident entity earns substantial revenues from a singular transaction which provided a number of goods or services for consumption or use inside the State of Delaware. The court believes that declining to exercise personal jurisdiction over this entity simply because it stopped short of actually entering the State would unnecessarily limit the reach of the State's long-arm statute.

In the case at bar, Saajos twice manufactured a custom-made set of fire doors which were specifically designed to be installed in a particular vessel—first, the Twin Capes and, then, the Cape May. As a result of both of these projects, Saajos earned roughly $350,000. Most important, however, the third-party defendant knew at all times that these boats were "Delaware ferries." Recognizing that both the state and federal courts in Delaware have interpreted the language of the long-arm statute expansively, to reach as far as possible within the limits of due process, *see, e.g., Wilmington Supply Co. v. Worth Plumbing & Heating, Inc.,* 505 F.Supp. 777, 779–81 (D.Del.1980), *Hercules,* 611 A.2d at 480–81, the court interprets subsection (c)(4) to extend to Saajos given the unique facts of this particular case.

Finding that Saajos falls within the reach of the State's long-arm statute, the court now turns to an analysis of whether exercising personal jurisdiction over the third-party defendant would comport with traditional notions of fair play and substantial justice as required by the Due Process Clause.

### B. The Requirements Of Due Process.

■ As the Supreme Court has stated, due process requires that a defendant must have certain minimum contacts with the forum in order to ensure that the "maintenance of the [law]suit does not of-fend 'traditional notions of fair play and substantial justice.' " *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278, (1940)). In other words, the defendant must be able to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir. 1981) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). However, as the Third Circuit has noted, "mere placement of a product into the stream of commerce with an awareness that it may end up in a particular state [i]s not enough to establish minimum contacts." *See Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 281 (3d Cir.1994) (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Instead, the defendant must engage in some sort of "additional conduct ... [which] indicate[s] an intent or purpose to serve the market in the forum State." *See Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

■ Here, as the Authority correctly points out, the fire doors which Saajos made did not wind up in Delaware by happenstance or by accident. Instead, the fire doors were custom-made by Saajos for installation in two different Delaware ferries. In undertaking this project, Saajos received plans and specifications which not only provided the dimensions for these doors but also identified the DRBA as the owner of the vessels. Thus, it was not simply *foreseeable* but, instead, *certain* that the doors would be used, at least in part, in Delaware.

While Saajos claims that subjecting it to jurisdiction here would be unfair given its ignorance of the intricate geography of a foreign land, the court believes that the one place where the Finnish company should expect to be sued over a transaction concerning "Delaware ferries" is in Delaware. The fact that Saajos was aware that

**442**

passengers on board other ferries were being injured as they tried to open fire doors with similar handles only bolsters this conclusion since, given their nature, these injuries had to have occurred where the vessels were operating and not where the doors were either made or installed.

Finding that Saajos specifically designed its fire doors for use in the State of Delaware and that the company was aware that the handles on these doors were potentially dangerous, both additional contacts which meet the *Asahi* criteria, the court concludes that subjecting the third-party defendant to personal jurisdiction in this instance comports with traditional notions of fair play and substantial justice and, thus, satisfies the requirements of due process.

IV. CONCLUSION.

In reaching this decision, the court has tried to refrain from collapsing the long-arm and due process inquiries. *See Intel,* 20 F.Supp.2d at 694 (citing *Red Sail,* 1991 WL 129174, at *3). However, the court notes that given the precedent in this State and District of interpreting the long-arm statute to confer jurisdiction to the "maximum parameters of the due process clause," *see, e.g., Jeffreys,* 784 F.Supp. at 151 (collecting cases), the reach and grasp of the long-arm statute should equate with each other. In addition, in crafting this opinion, the court has taken heed of the Third Circuit's instruction that the fairness requirements of the Due Process Clause should not be extended so far as to "permit a manufacturer to insulate itself from the reach of the . . . State's long-arm [statute] by . . . professing ignorance of the ultimate destination of its products." *See DeJames,* 654 F.2d at 285.

Here, as its own internal documents show, Saajos knew that it was manufacturing fire doors for "Delaware ferries." In addition, Saajos knew that the handles on these doors might cause injury. Consequently, finding itself in Delaware as a party to a lawsuit filed by a person who

may have been injured by one of the doors Saajos supplied should come as no surprise. For these reasons, the motion by Saajos to dismiss for lack of personal jurisdiction is denied. An appropriate order shall issue.